## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**LAWRENCE A. FESTA,**
        **Petitioner,**

**v.**                                                    **Case No.  3:06cv74/MCR/MD**

**WALTER A. MCNEIL,**[1]
        **Respondent.**

_____

## ORDER and
## REPORT AND RECOMMENDATION

**Before the court is a petition for writ of habeas corpus filed pursuant to Title 28 U.S.C. § 2254 with amended memorandum in support (docs. 1, 6).  Respondent has filed a response (doc. 14) to which petitioner has replied (doc. 17).  The record has been supplemented with additional portions of the record (docs. 21, 27, 29, 31). The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).   It is further the opinion of the undersigned that the pleadings and attachments before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.**

_____

[1]**Walter A. McNeil succeeded James R. McDonough as Secretary of the Florida Department of Corrections, and is automatically substituted as the respondent.  Fed.R.Civ.P. 25(d)(1).**

## BACKGROUND AND PROCEDURAL HISTORY[2]

Petitioner was found guilty by an Okaloosa County, Florida jury of kidnapping with a weapon, and four counts of sexual battery with great force or a weapon, and was sentenced to life in prison.  The victim was petitioner's estranged wife, Lori.  The prosecution's witnesses testified essentially as follows (doc. 14, ex. H, pp. 311-415):[3]

At the time of the offenses involved in this case petitioner was 6'5" tall and weighed 320 pounds.  Lori was 5'4" tall and weighed 112 pounds. Petitioner and Lori were married for approximately seven years.  In late February 1997 Lori moved out of the marital mobile home in Mary Esther, Florida and moved in with her twin sister in Milton, Florida.  Approximately six weeks later, on the evening of April 11, 1997 Lori, her sister and some friends spent the evening at a lounge in Crestview, Florida.  They left after midnight, and Lori went home with a friend, Wade Hutto.  Lori's sister called at around 3:00 a.m. and told Lori that her husband had called wanting to know where she was.  Lori talked to the petitioner, who told her that he would kill her if she was with a man.

Lori returned to her sister's home in Milton, where there were threatening recorded telephone messages from petitioner.  At some point early that same morning petitioner told Lori on the telephone that he wanted her to come to the marital home because he had received money from a personal injury lawsuit, and wanted to give her a share as he had promised.  Not trusting him, Lori convinced her sister and another female friend to go with her.  Petitioner wanted Lori there by 6:00

---

[2]The facts stated herein are those presented at trial and viewed in the light most favorable to the prosecution.  Where there are conflicting inferences and disputes exist, this court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that resolution.  *Martin v. State of Alabama*, 730 F.2d 721,724 (11th Cir. 1984).  Although this court is not called on to address directly the sufficiency of the evidence, the evidence presented to the jury plays a part in the court's analysis.

[3]Hereafter, all references to exhibits will be to doc. 14, unless otherwise noted.

a.m. so that his roommate, who went to work early, could witness him giving Lori the money.

When the three women arrived at petitioner's home the front door was open but the glass storm door was closed.  Lori saw petitioner standing inside holding a blue box in which he kept his important papers.  When Lori opened the storm door and stepped inside, petitioner pulled a machete from his pants, grabbed Lori, shoved one of the other women off the front porch, screamed that if they "called the fucking cops" he would kill her, and slammed the door.  He carried Lori to the master bedroom.  The windows had been masked with blankets.  On the bed was a vibrator, KY jelly, and ropes that she had never seen before.  Petitioner tied Lori's arms and one leg to the bedposts, hit her in the chest, held a knife to her throat, told her to stop screaming, and gagged her by stuffing a blue cloth in her mouth.  Petitioner then cut off her clothes with a knife, shaved  her pubic area, and serially raped and sodomized her with his penis (anally and orally), a carrot (vaginally), and a vibrator (anally).  He took close-up photographs of his activity with a Polaroid camera.

Lori pleaded throughout, and petitioner finally took out the gag and untied Lori's arms.  The telephone rang and petitioner handed it to Lori.  The caller was a police dispatcher.  Lori did not scream or tell the dispatcher what was happening because she was nude, tied to the bed by one leg, and petitioner had a machete and a knife.  Petitioner took the phone, said "no," and hung up.  Then there was banging on the door by a deputy sheriff, and petitioner yelled "Back off, I've got a gun and a hostage, and I'll hurt her!"

Petitioner went into a closet, forcing Lori to go with him.  He had a cordless phone, and over the next two hours they both talked to officers, petitioner's father, a lawyer, and friends.  At one point a recording of the dispatcher's calls had petitioner saying "Tell them I'm not going to hurt you" and Lori saying "I believe

you're not going to hurt me."  Lori also told the dispatcher or a deputy she was not being hurt, that just she and petitioner were present, and that she did not want to leave.  Lori told petitioner she was sorry, that she would return to him - anything to keep him from hurting her.

The ordeal lasted something over two hours.  Deputy Christopher Lahr talked to petitioner and Lori several times.  At some point (not knowing about the sexual assaults, and believing that Lori was "okay" as she told him) he assured petitioner that if no one was hurt he would be taken to the hospital for psychological evaluation.  Petitioner finally agreed to release Lori, and the two exited the home.[4] Lori was wearing different clothes from what she was wearing when she went in. Lori told a sheriff's investigator that she did not want to press charges because nothing had happened (Lori told the jury she said this because she feared for her life).  Petitioner was taken to a hospital for mental evaluation.  Two days later Lori changed her mind, and reported what happened to the authorities.  About three weeks later, under pressure from petitioner (who by that time had been arrested) and his family, she signed a request, prepared by petitioner's divorce attorney, that the charges be dropped (the "drop request").  The prosecutor asked her to come in and discuss it, and she told him she had signed the drop request because of the pressure, but she did not change her version of what happened on April 12.  When the assistant state attorney told her that the prosecution would proceed anyway, she asked that the drop request be withdrawn.  Lori's version was fully corroborated at trial by the testimony of her sister and the other friend, by Lori's blood on the bandana petitioner used as a gag, by sheriff's deputies who responded to the scene, and by recordings of the dispatcher's calls.

---

[4]Lori testified that petitioner sexually assaulted her while they were in the closet.  The jury acquitted petitioner of that count.

Given the great disparity between petitioner's version of events and Lori's, it is appropriate to summarize petitioner's testimony at trial (ex. H, pp. 875-961):

Petitioner has eleven prior felony convictions, but none involving sexual battery.  His marriage to Lori had its usual ups and downs, but mostly ups.  Petitioner was on probation restriction when all this happened so he could not move freely.  His wife had started spending week-ends at her sister's house, and petitioner became suspicious of it.  Lori ultimately left the marital home in late March, 1997.  She drove past their home going to and from work, and even though she had left him, she would stop in daily, either in the early morning or after work, and the two would have consensual sex.  Petitioner had been injured in a motor vehicle accident and had difficulty holding himself up in the coital position, so they had a lot of oral sex.  While they were still together Lori had become interested in bondage, and would tie petitioner to the bed posts and perform oral sex on him.  This continued even after she left him.

On the evening of April 11, 1997, Lori was at her sister's house.  Petitioner called the house just to talk to his wife, as he frequently did, even though they were separated.  There was no answer.  He kept calling.  Finally, at around 3:30 a.m. he got frantic and drove to the sister's home.  The sister's husband told him Lori was with some carpenter in Pensacola.   The sister came out and handed him a telephone.  Lori was on it, and started screaming at him about checking up on her.  He went home;  Lori returned to her sister's house and Lori and petitioner talked on the telephone.  He wanted to talk to her to get some assurance that their marriage was not completely dead, so told her (falsely) that he had received money from the settlement of his motor vehicle accident lawsuit, and convinced her to come over so he could pay her a portion.  When she showed up with her sister and another woman he was upset because he wanted to talk to his wife alone, so he picked up a machete leaning against the wall and told the other two women to get out, pushing one of

them.  He and Lori went to the bedroom.  Lori carried the machete to the bedroom while petitioner put his dog out the back door.  When he entered the bedroom, Lori was sitting on the bed smoking a cigarette, and gave him a good tongue lashing about checking up on her.

The telephone rang.  Petitioner walked to the kitchen, picked it up, took it to the bedroom and handed it to Lori.  Lori told petitioner that a man wanted to talk to him, so he took the phone.  The man told him there was a deputy outside who wanted to talk to him.  Petitioner was distraught and rattled, knew he had violated his probation by driving to Milton, and did not want to be bossed around by an authority figure, so he said "no" and hung up.  The two of them were still in the bedroom, and Lori was not restrained in any way.   There was banging on the door.  He and Lori were both afraid of getting shot, and they had a lot to talk about.  They got in a closet, primarily to protect Lori from any bullets coming through the window.  There were a lot of telephone calls to law enforcement and family members, and Lori assured everyone that she was fine, that there was no one else in the house, and that petitioner did not have a gun.  Petitioner told Lori many times that she could leave any time she wanted to, but she stayed.  There was no sex, no shaving of Lori's pubic area, no gag, no tying up, no knife, no violence, no problems - just talk.  They finally went outside.  Petitioner told the jury there were carrots in the house because his dog liked to eat them.  The blue bandana that the state claimed was used as a gag was a bandana his dog wore.

## STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April

24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000).[5]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the

---

[5]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); *Ramdass v. Angelone*, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L.Ed.2d 125 (2000).  In employing this test, the Supreme Court has instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L.Ed.2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by Parker v. Head*, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L.Ed.2d 263 (2002) (quoting *Williams*,

529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  *Williams*, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it.  *Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L.Ed.2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."  *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion."  *Williams*, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see e.g. Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); *Jones v. Walker*, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti v. Quarterman*, __ U.S. __ 127 S. Ct. 2842, 2858, 168 L.Ed.2d 662 (2007); *Jones*, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

## OTHER CONTROLLING LEGAL PRINCIPLES

**Ineffective assistance of counsel.**

Petitioner's first three claims for relief in this court are grounded on his contention that he was denied his constitutional right to the effective assistance of counsel.   In order to prevail upon a claim of ineffective assistance of counsel, the petitioner must prove that:  (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"The purpose of ineffectiveness review is not to grade counsel's performance."  *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*).  In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance.  *Chandler* at 1314.  "Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).  In evaluating the reasonableness of counsel's actions, a court must make "every effort . . . to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.  As the Eleventh Circuit has emphasized:

> We must avoid second-guessing counsel's performance: "[I]t does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance."  *Waters* [*v. Thomas*, 46 F.3d 1506], 1522 (en banc).  Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness.  *Chandler* at 1314 (footnote omitted).  Moreover, an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation.  Where the record

**is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment.**

*Chandler* at 1314 n.15.

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding."  466 U.S. at 693, 104 S.Ct. at 2067.  Instead, the petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.*, at 694, 104 S.Ct. at 2068.  Without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not sufficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs.  *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

<u>Exhaustion and Default.</u>

Respondent contends that petitioner did not appropriately present several of his current claims to the state court for review, and is procedurally barred from doing so now; therefore, this court should not consider the claims.  It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the

petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[6] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  *Duncan, supra*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Picard*, 404 U.S. at 277-78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In *Picard v. Connor*, *supra*, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.* at 278, 92 S.Ct. at 513, the Court rejected the contention that the petitioner satisfied the exhaustion requirement

---

[6]Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

    (A)  the applicant has exhausted the remedies available in the courts of the State; or

    (B) (I)  there is an absence of available State corrective process; or

     (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In *Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7, 103 S.Ct. at 278 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)). The only manner in which the habeas petitioner had cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Anderson*, 459 U.S. at 7, 103 S.Ct. at 278 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. 459 U.S. at 7 and n. 3, 103 S.Ct. at 278 and n. 3.

Years later, the Supreme Court readdressed the "fair presentation" requirement in *Duncan v. Henry*, *supra*. The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal

review of the issue.[7]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Duncan*, 115 S.Ct. at 888.  More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 1351, 158 L.Ed.2d 64 (2004).  The *Baldwin* Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  *Id.*  This language, while not part of the Court's holding, provides an instructive and useful rule of thumb.  With regard to this statement, the Eleventh Circuit stated in *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"  *McNair* [*v. Campbell*], 315 F. Supp. 2d at 1184 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L.Ed.2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in

---

[7]The petitioner in *Duncan* raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

the haystack of the state court record.'"

*Id.*, 416 F.3d at 1302-03 (citations omitted).[8]

The Eleventh Circuit, prior to *Duncan*, had broadly interpreted the "fair presentation" requirement.[9]  However, after *Duncan*, the Eleventh Circuit has taken a more restrictive approach.  For example, in *Zeigler v. Crosby*, the Circuit Court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the Federal Constitution.  345 F.3d 1300, 1307 (11th Cir. 2003).  The court specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Florida Constitution and Florida's Due Process Clause.  *Id.* at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the

---

[8]In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

[9]*See, e.g., Watson v. Dugger*, 945 F.2d 367 (11th Cir. 1991) (finding issue to be exhausted when petitioner argued in state court that trial court misapplied state law when it refused to give petitioner's requested jury instruction and thereby allowed the jury to convict without necessary showing of criminal intent, and argued in federal court that this was a due process violation); *Mattox v. Dugger*, 839 F.2d 1523 (11th Cir. 1988) (holding that a federal habeas corpus petition should not be dismissed on grounds of procedural default when a petitioner has previously brought an issue before a state court alleging only state law violations, when such a claim is equally supported by federal law, and the state cites such federal law in support of its position); *Hutchins v. Wainwright*, 715 F.2d 512, 518-19 (11th Cir. 1983) (petitioner exhausted Sixth Amendment confrontation clause claim in state court by raising hearsay objections, even though petitioner never raised Sixth Amendment claim in state court).

United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us." *Id.*

An issue that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review.  *O'Sullivan*, 526 U.S. at 839-40, 848, 119 S.Ct. at 1734; *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L.Ed.2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Bailey*, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L.Ed.2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be firmly established and regularly followed,

that is, not applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S.Ct. 850, 858, 112 L.Ed.2d 935 (1991); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. *Tower v. Phillips, supra.* To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 85, 130 L.Ed.2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*


## PETITIONER'S GROUNDS FOR RELIEF

Petitioner's first three grounds for relief are based on ineffective assistance

of counsel.  All were presented to the state court in petitioner's motion for post-conviction relief pursuant to Fla.R.Crim.P. 3.850.[10]

    1.    <u>Ineffective assistance of counsel - failure to object to prosecutorial misconduct.</u>

In his first ground for relief petitioner contends that his attorney was ineffective because he failed to object to multiple instances of egregious trial conduct by the prosecutor.  Petitioner says the prosecutor was guilty of misconduct in (A) slamming a machete on the podium while cross-examining petitioner in such a way as to frighten the jury, and then making a "Golden Rule" argument by asking the jury to put itself in the place of someone facing a machete in the hands of a 300 pound man, (B) calling the petitioner a liar, and (C) "others," including calling the petitioner a son-of-a-bitch, calling the petitioner stupid, stating his personal belief, vouching for the state's witnesses, improperly re-enacting the crime, attacking defense counsel, and telling the jury to ignore the court's instructions.  Petitioner contends that he did not receive a fair trial because defense counsel did not object to any of this improper behavior.

<u>State Court Decision</u>

This series of claims was presented to the state court in three different grounds in a motion for post-conviction relief pursuant to Fla.R.Crim.P. 3.850 (ex. P, pp. 28-31 ("Issue IV"); 97-104 (Issue XV); 105-122A ("Issue XVI").  The Rule 3.850 court held a hearing on all three grounds.  Based upon the record and the testimony

_____

[10]In his response to these first three grounds for relief, respondent argues that petitioner is not presenting ineffective assistance of counsel claims but is instead arguing substantive law, and that since he did not raise the substantive parts of these claims in the state court, the claims are defaulted.  Respondent's point is wide of the mark.  In each of the first three grounds petitioner argues that his attorney's performance was deficient *because* counsel failed to object or otherwise act on issues in which the law on the particular issue was well settled.  Stated another way, the alleged ineffective assistance on counsel's part is based on counsel's alleged failure to make an appropriate motion or objection.  Accordingly, the court rejects respondent's procedural default argument, at least with respect to petitioner's ineffective assistance claims.

of defense counsel, Mr. Petersen, the court held that the prosecution's actions were not improper, and in any event, based on *Strickland*, that counsel's decision to remain mute in the face of the alleged prosecutorial misconduct was a tactical and/or strategic decision, and that the decision was a reasonable one. In summarizing its findings, the court said:

> This Court finds that Mr. Nicholas Petersen is a highly competent, highly-trained, imminently [sic] experienced and diligent advocate. Review of the record reveals that Mr. Petersen was highly prepared to advance the defendant's claimed defense, in the face of overwhelming evidence of defendant's guilt. Mr. Petersen's cross-examinations of all state witnesses demonstrate conclusively that he was so prepared as he pointed out practically every inconsistency, however minute, in a trial in which the demonstration of the inconsistency of the complaining witness Lori Cash was the defendant's main hope for acquittal. Mr. Petersen's efforts by filing Motions in Limine, prevented the trial jury from learning of the damning evidence that the defendant had allegedly solicited Alex Viola to have the victim Lori Cash murdered prior to trial in order to escape justice and prevented the State from presenting the testimony of Kenneth Groves that defendant had confessed his crimes. Mr. Petersen also competently assimilated and introduced defense exhibit evidence and witnesses that enhanced the defendant's difficult position. It is apparent from the record that Mr. Petersen did not sit idly by in the face of the prosecution, but interposed numerous objections and challenges he deemed necessary and appropriate. A few examples of objections interposed:
>
> (a)  objection to double hearsay in Tracy Wiles' 911 call tape recording (Attachment U, Trial Transcript pages 173-174)
>
> (b)  objections to hearsay during testimony of Attorney John Townsend (Attachment U, Trial Transcript pages 419-421)
>
> (c)  objection to hearsay of Tracy Wiles during testimony of Linda Cash (Attachment U, Trial Transcript page 491)

(d)     objection based on outside the scope during prosecutor's cross of defense witness Christine Perry (Attachment U, Trial Transcript pages 797-798)

(e)     objection to testimony of Assistant State Attorney William Bishop (Attachment U, Trial Transcript pages 962-966)

Defendant's appellate counsel apparently determined that the only issues which merited consideration on direct appeal were the denial of the Motions to Suppress, the denial of the defendant's Motion to Disqualify the State Attorney's Office, and denial of Mr. Peters[e]n's objection to the testimony of Assistant State Attorney William Bishop. Appellate defense counsel correctly determined that there was either no prosecutorial misconduct, or at least none which constituted reversible fundamental error. (See Attachment "T", Initial Brief of Appellant).

In *Strickland*, the United States Supreme Court stated:

"Because of the difficulties inherent in making the evaluation (of ineffectiveness), a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy". *Strickland*, 466 U.S. @ 689 [sic].

As recognized by the Florida Supreme Court in *Chandler v. State*, 848 So 2d 1031 (Fla. 2003), "The decision not to object to improper comments is fraught with danger and may not be wise strategy". Nonetheless, Mr. Peters[e]n was the experience [sic] professional charged with the responsibility to develop and follow his trial strategy. The evidence is overwhelming that Mr. Peters[e]n has many years of experience and has tried many felony cases with success and had appropriately kept up with his legal education. Based on his testimony at the evidentiary hearing this Court finds it was reasonable for him to believe that the prosecutor was undermining his own case and that it was in his client's best interest to avoid a mistrial. Therefore, the defendant has failed to establish the requisite ineffectiveness of trial

counsel under the first prong of _Strickland_.  The defendant's ultimate conviction has more to do with the strength of the evidence against him than any improper actions by the prosecutor that was not met with objection.

Furthermore, to the extent that this Court's findings suggest that the prosecutor's actions and argument on occasion did exceed or stretch the bounds of proper argument and defense counsel failed to object, the failure did not prevent the defendant from having a fair trial and he has further failed to establish prejudice under the second prong of _Strickland_.

(Doc. 14, Ex. P, pp. 873-75).

 Federal Review of State Court Decision 

In the following analysis the undersigned will discuss the underlying legal standards involved in this ground for relief, and will then show that (1) the prosecutor's actions and arguments were not improper, individually or taken as a whole, so counsel's failure to object was not ineffective assistance of counsel, and (2) if the prosecutor's actions and arguments were improper, counsel's failure to object was a tactical or strategic decision that was reasonable, so counsel's assistance was not ineffective.

In order to succeed on this claim, petitioner must show, first, that the prosecutor's behavior was improper.  If the prosecution's behavior was not improper, there was no basis upon which counsel could object.  It is long established Supreme Court law that prosecutors must refrain from improper methods calculated to produce a wrongful conviction; they may strike hard blows but are not at liberty to strike foul ones. _Berger v. United States_, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 74 L.Ed.2d 1314 (1935). "A lawyer shall not . . . state a personal opinion as to . . . the credibility of a witness . . . or the guilt or innocence of an accused" and shall not "use arguments calculated to inflame the passions or prejudices of the jury." _Darden v. Wainwright_, 477 U.S. 168, 181, 106 S.Ct. 2464,

2471, 91 L.Ed.2d 144 (1986) (citing Model Rules of Professional Conduct, Rule 3.4(e) (1984);  Code of Professional Responsibility, DR 7-106(C)(4) (1980);  ABA Standards for Criminal Justice:  3-5.8(b) (2nd Ed. 1980)).

In applying the various professional standards to the conduct of attorneys who appear before them, courts must not lose sight of the reality that "[a] criminal trial does not unfold like a play with actors following a script." *United States v. Young*, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1 (1985) (quoting *Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976)).  "[I]n the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused."  *Id.* (*citing Dunlop v. United States*, 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799 (1897)).

Challenges to allegedly improper prosecutorial comments are not infrequent. However, in evaluating a prosecutorial indiscretion:

> it is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

*Darden, supra* (internal citations omitted); *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *United States v. Young, supra*.  Inappropriate prosecutorial comments, standing alone, do not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.  Instead, the remarks must be examined within the context of the trial.  *Young,*  470 U.S. at 11, 105 S.Ct. at 1044.  And not every remark that stings is improper.  "In closing argument, a prosecutor is not prohibited from making 'colorful and perhaps flamboyant' remarks if they relate to the evidence adduced at trial."  *United States v. Mock*, 532 F.3d 1299, 1302 (11th Cir. 2008) (*quoting United States v. Jacoby*, 955 F.2d 1527, 1541 (11th Cir. 1992).

If petitioner succeeds in showing this court  that, contrary to the Rule 3.850

court's conclusion, the prosecution's behavior was improper, he must go on to show that the Rule 3.850 court's further decision approving counsel's decision not to object "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d) (1); *Williams v. Taylor, supra.* The Rule 3.850 court made a factual finding that counsel's overall decision not to object was strategic. "Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component." *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998); *Jackson v. Herring*, 42 F.3d 1350, 1357 (11th Cir. 1995). Whether a particular decision by counsel was a tactical one is a question of fact, *Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); *Jackson*, 42 F.3d at 1367; *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether a particular tactical decision was a reasonable one, however, is a question of law, *Hardwick* at 1163; *Jackson*, 42 F.3d at 1367; *Horton*, 941 F.2d at 1462, and habeas relief is mandated only where the trial court's decision was either contrary to, or an objectively unreasonable application of, clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (quotation marks and citation omitted); *see also Waters v. Thomas*, 46 F.3d 1506, 1518-19 (11th Cir. 1995) (en banc) (observing that "[w]e cannot, and will not, second guess" the "strategic decisions trial counsel are called upon to make"). "[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy." *Johnson v. Alabama,* 256 F.3d 1156, 1176 (11th Cir. 2001).

After all, "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *accord, e.g., Waters v. Thomas*, 46 F.3d at 1522 ("Three different defense attorneys might have defended Waters three different ways, and all of them might have defended him differently from the way the members of this Court would have, but it does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance.").

A.   The machete and the Golden Rule.

During cross-examination the prosecutor was asking petitioner why he had a machete by the door.  Petitioner said he wanted to scare Lori's sister away, because she was always barging in and trying to run everything.  The prosecutor asked why petitioner did not just shove the other women out the door, as he admitted he did, when he knew that shoving them was simple battery while brandishing the machete was aggravated battery (a crime for which petitioner had been convicted before).  While referring to the machete ("one of these"), which he was holding, the prosecutor slammed it against a legal pad on the podium (ex. H, p. 957).  Defense counsel did not object.  The prosecutor later told the jury he did not strike anyone (with the machete) but he may have scared somebody in the courtroom.  At the Rule 3.850 hearing defense counsel testified that he heard the machete being slammed, but did not object because he thought the prosecution was being overly theatrical.  Petitioner did not hit anyone with the machete, and counsel thought  the prosecutor's theatrical behavior was helpful overall, especially since the prosecutor was obviously trying to goad the petitioner (who was on the stand at the time) to react, which did not happen (ex. P, p. 1573). The Rule 3.850 court made no specific finding on whether slamming the machete was improper, but the undersigned finds that it was not.  It was surprising, perhaps, possibly even close

to the line, but far from being so inflammatory as to affect the fairness of the trial. The Rule 3.850 court noted that during closing argument defense counsel told the jury that he (counsel) did not slam the machete, and neither did petitioner (ex. P, p. 849).  The court found that the decision not to object was a reasonable tactical one because it differentiated the prosecutor's behavior from his own (*id.*).

Petitioner also argues that during closing the prosecutor told the jury that he had slammed the machete "to get a little impression across to you of how maybe she felt at that time . . . ."  (Ex. P, p. 1015).  The Rule 3.850 court found that this comment was not objectionable because it did not rise to the level of a Golden Rule argument, as petitioner contends.  The court reasoned that the prosecutor did not ask the jurors to put themselves in the victim's place, and cited Florida law that a Golden Rule argument is one in which counsel asks the jurors to put themselves in the victim's place, that they imagine that the victim was a friend or relative, or something similar (ex. P, p. 849) (citing *Williams v.* State, 689 So.2d  393 (Fla. 1st DCA 1977)).

This court concludes that the state court's ruling did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d) (1); *Williams, supra.*  Slamming the machete was a hard blow but not a foul one.  *Berger v. United States, supra.*  The Rule 3.850 court did not find that it was improper conduct on the prosecutor's part, and in either event, counsel did not object for tactical reasons.  This court defers to the determination that not objecting was tactical, and this court agrees that the tactical decision was not an unreasonable one.  It was not unreasonable because the behavior was not objectionable in the first place (in spite of petitioner's repeated reference to the act as "egregious" (doc. 1, pp. 11-14)), so an objection would have been overruled, even though the prosecutor was apparently more theatrical than the evidence merited.  As noted above, the evidence against petitioner was not, as he

repeatedly claims, Lori's word against his.  Two eye witnesses were threatened with a machete and one was shoved out the door while petitioner forced Lori into the home; petitioner yelled that he had a gun; there was a two-hour stand-off after the kidnapping and sexual assaults; the handkerchief that petitioner used to gag Lori had her blood on it; a carrot was found in the trash can next to the bedroom; there were pieces of rope attached to the bedposts consistent with Lori's testimony; and Lori's testimony was *entirely* consistent with the physical evidence.  Given the evidence, counsel's decision to take the high road was well within the bounds of professional competence.  It might not have been the best decision, but it was not one that no competent counsel would have made.

Finally, petitioner says that the Rule 3.850 court's finding that the prosecutor's statement to the jury was not a Golden Rule argument was erroneous.  That does not help him here.  Petitioner has not shown this court that the Golden Rule concept is constitutionally based, nor has the court found any support for that contention.  In this case the question of whether the Golden Rule was improperly invoked was a question of Florida law.  The state court has already answered the question of what would have happened had defense counsel made a Golden Rule objection.  the objection would have been overruled.  It is not this court's place to second guess Florida courts on Florida law.  *Herring v. Secretary, Dep't of Corrections*, 397 F.3d 1338 (11th Cir. 2005); *Callahan v. Campbell*, 427 F.3d 897 (11th Cir. 2005).  Therefore, defense counsel was not ineffective for failing to make that objection.

B.      Calling the petitioner a liar.

Next petitioner says that the prosecutor's behavior during closing argument was improper when he called the petitioner a liar.  The prosecutor did not directly call petitioner a liar, but he certainly called petitioner's veracity into question, given the huge disparity between petitioner's version of events and all the other evidence.  The prosecutor used words and phrases like preposterous, ridiculous, untrue, a lie

crafted to fool the jurors, a story, bull, a line of bull, and hogwash (ex. H, pp. 1013, 1020, 1025, 1030, 1074, 1082, 1084).[11]  **The Rule 3.850 court held that the prosecutor's use of these terms was a fair comment on the evidence (ex. P, p. 864).  Petitioner argues that this was error, because federal courts have held that it is entirely improper to call a defendant a liar, citing** *United States v. Rodriquez-De Jesus*, **202 F.3d 482, 486 (1st Cir. 2000).  That case is not dispositive, since it involved the actual use of the term "liar" (not used here), and the crime charged was submitting a false claim to a federal agency.  Even so, the** *Rodriquez-De Jesus* **court did not reverse, finding that in context the use of the term was not inappropriate.**

**The undersigned has carefully read the entire trial transcript, and cannot disagree that a reasonable jury could find that petitioner's testimony, when contrasted with all the other evidence, was as described by the prosecutor.  That the prosecutor pointed this out to the jury was not improper.  That the jury agreed is not surprising.  In** *Portuondo v. Agard*, **539 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000), a case involving facts similar to these, the prosecutor told the jury that the defendant was lying, was a smooth slick character who had an answer for everything, that everything the defendant said sounded rehearsed, and that he sat through the entire trial before testifying and used the testimony that preceded his to his advantage. The trial court held that these statements were fair comments on the evidence. Defendant argued in his subsequent federal habeas case that the comments prejudiced his right to be present at trial.  The Court disagreed, holding that there had been no constitutional violation, reasoning that when a defendant elects to testify he is subject to cross-examination and his interest in the outcome can be commented on during closing.  That is, when a defendant takes the stand, "his credibility may be impeached and his testimony assailed like that of any other**

---

[11]It is worth a passing note that the first use of the word "liar" came when defense counsel cross-examined Lori, and asked her point-blank if she was a liar (ex. H, p. 413).

witness[,]" 539 U.S. at 69, 120 S.Ct. at 1125, quoting *Brown v. United States*, 356 U.S. 148, 154, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958).  Thus, a testifying defendant can be treated as any other witness.  529 U.S. at 73, 120 S.Ct. at 1127.  Although the constitutional claim in *Portuondo* was slightly different from the argument petitioner makes here, the result is instructive.  Petitioner testified, and his testimony was fairly commented on by the prosecutor.  Nothing the prosecutor said infected the trial with unfairness.

Petitioner also argues that the state shifted the burden of proof to the defense when he told the jury in effect that if credibility was the issue, there was only one decision the jury could make (ex. H, pp. 1012-13).  It is odd that petitioner says that credibility somehow should not have been the central issue.  In truth, since petitioner elected to testify and gave a version of events totally at odds with *all* the other evidence, credibility became the critical issue.  The prosecutor did not shift the burden of proof by pointing out the obvious.

C.     Other conduct.

The balance of petitioner's prosecutorial misconduct claims are similar.  He says the prosecutor called him a son-of-a-bitch.  He did not.  In closing the prosecutor was explaining why Lori was calm and uncomplaining while on the telephone with the sheriff's dispatcher: she had just been sexually assaulted and sodomized, was nude, tied to the bed, the petitioner had a machete and a knife, she was terrified, and she should not have been expected to "start yelling 'This son-of-a-bitch is about to kill me . . . .'"  (Ex. H, p. 1080).  Colorful, but not improper.  The Rule 3.850 court so held, noting that petitioner himself first used the term (ex. H, p. 869), and that it was mildly derogatory and harmless in any event when compared to the actual evidence of what happened to Lori (ex. P, p. 869).

Petitioner says the prosecutor called him stupid.  That much is true.  He recounted how, among other things, petitioner was stupid enough to confine his

wife in their home with sheriff's deputies waiting outside.  But as the Rule 3.850 court held, that was a fair invited comment based on defense counsel's rhetorical question to the jury on whether petitioner was so stupid that he did not clean out incriminating evidence before his bedroom was searched.

Petitioner also contends that the prosecutor engaged in an improper re-enactment of the crime during closing.  Specifically, petitioner argues that the prosecutor used the Polaroid camera that had been introduced in evidence, and actually took some pictures, at least one of which showed some of the juror's legs. Moreover, petitioner claims the prosecutor used the camera, apparently during a recess before his closing, so that it had effectively been tampered with.  The Rule 3.850 court rejected this claim, reasoning that there had been no proof that defense counsel was even aware that the prosecutor had done anything with the camera during the recess, and further that the happenstance inclusions of jurors legs on photographs taken during the re-enactment - photographs which were *not* introduced in evidence - was not improper, particularly since the petitioner was not charged with taking photographs.  Also, the court held that (1) this was not a violation of the Golden Rule prohibition, as petitioner claimed, since the jury was not asked to put itself into the place of anyone, much less the victim, and (2) the re-enactment was a fair response to defense counsel's argument that the initial criminal acts could not have happened within the six minute time frame testified to by Lori (ex. P. pp. 861-64).

Petitioner also says the prosecutor vouched for the credibility of some of the state's witnesses.  The Rule 3.850 court addressed these various claims in detail, and concluded that there was nothing improper in the prosecutor's using the term "credible" in referring to state witnesses.  Specifically, the prosecutor did not say, nor even hint, that the jury should believe a particular state witness *because* he was a law enforcement officer (ex. P, pp. 866-68).

Petitioner next argues that the prosecutor stated his personal beliefs during closing and told the jury to ignore the court's instructions.  These claims were not presented to the state court in the Rule 3.850 motion, were not addressed at the Rule 3.850 hearing, and were not ruled on by the Rule 3.850 court.  Petitioner therefore failed to present these claims fairly to the state court.  It is too late for him to go back to the state courts, so the claims are procedurally defaulted.   He has not suggested any official impediment as cause for his failure to present them, and he has not presented the kind of new relevant evidence of innocence not presented at trial that would justify making a miscarriage of justice exception, as in *Schlup, supra.*  Thus, the claims will not be considered by this court.

Finally, petitioner relies on *Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000).  There, the state accused the defendant of sexually assaulting his girlfriend's daughter.  The only evidence of the crime was the young woman's testimony.  The prosecutor belittled the defendant's character, emphasizing that he did not work, that he beat his girlfriend regularly, drank too much and did not contribute to his girlfriend's expenses.  The court found that defense counsel's failure to object was deficient, and that petitioner was prejudiced thereby.  The case is distinguishable for two reasons.  First, the prosecutor in this case did not attack petitioner's character in the same way the state in *Hofbauer* did.  He emphasized petitioner's eleven prior felony convictions, but mostly he focused on the discrepancies between petitioner's testimony and the rest of the evidence.  Second, the *Hofbauer* court found prejudice because that case really was a swearing match between two people, with no corroborating evidence.  That is far from the case here.  As noted above, and as noted by the Rule 3.850 court, petitioner was convicted based on the strength of the evidence, not because of any inflammatory acts or remarks by the prosecutor.

Petitioner has picked through an 1100 page trial transcript, culled out every instance in which the prosecutor said something he found hurtful, and tried to

convince the Rule 3.850 court that the comments were improper and that his attorney should have objected to them.  The Rule 3.850 court disagreed, and this court does as well.  This was a hard fought, emotion-filled trial, with drastically differing versions of what was either a kidnapping and serial sexual assault, or an innocent discussion between a distraught husband and his wife.  The state hit hard, but it did not hit unfairly.  Counsel had nothing to object to, and was not ineffective.  The prosecutor's actions and arguments were not improper, individually or collectively.  In any event, defense counsel had valid strategic reasons for not objecting.  Therefore, the state court's ruling did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d) (1); *Williams, supra*.  Petitioner is not entitled to federal habeas relief, and the writ should not issue.

2.      <u>Ineffective assistance of counsel - failed to move to disqualify prosecution team in light of *Massiah v. United States.*</u>[12]

        Petitioner next contends that the prosecution used an undercover agent to obtain defense strategies, and although his attorney successfully moved *in limine* to keep the agent from testifying about any admissions petitioner may have made, counsel should have moved to disqualify the prosecution team because it improperly learned of his defense strategies.  The Sixth Amendment to the United States Constitution applies to post-indictment communications between the accused and agents of the government.   Such agents are prohibited from deliberately eliciting incriminating statements in the absence of counsel after the accused has been indicted.  *See Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 1203, 12 L.Ed.2d 246 (1964).  "[T]he clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to

_____

[12]377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d  246 (1964).

legal representation when the government interrogates him." *Brewer v. Williams*, 430 U.S. 387, 400, 97 S. Ct. 1232, 1240, 51 L.Ed.2d 424 (1977).  In *United States v. Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L.Ed.2d 115 (1980), the Court applied the principle of *Massiah* in the jailhouse informant context.  "In order to establish a violation of the Sixth Amendment in a jailhouse informant case, the accused must show (1) that a fellow inmate was a government agent, and (2) that the inmate deliberately elicited incriminating statements from the accused." *Lightbourne v. Dugger*, 829 F. 2d 1012, 1020 (11th Cir. 1987) (citing *Henry*, 477 U.S. at 270, 100 S. Ct. at 2186; *United States v. Taylor*, 800 F. 2d 1012, 1015 (10th Cir. 1986)).

No bright-line rule exists for determining whether an individual is a government agent for purposes of the Sixth Amendment's right to counsel.  *See Depree v. Thomas*, 946 F. 2d 784, 793-94 (11th Cir. 1991).  That determination must be made on the facts and circumstances of each case.  *See id.* at 794; *Lightbourne*, *supra*, 829 F. 2d at 1020.  "At a minimum, however, there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place." *Depree*, *supra*, 946 F. 2d at 794 (citing *Lightbourne*, 829 F. 2d at 1020).  Concerning such "deliberate" elicitation, the United States Supreme Court has commented that

> [T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation.  Since "the Sixth Amendment is not violated whenever–by luck or happenstance–the state obtains incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police.  Rather the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S. Ct. 2616, 2630, 91 L.Ed.2d 364 (1986)

(citing *Henry*, *supra*, 477 U.S. at 276, 106 S. Ct. at 2189)).

<u>State Court Decision</u>

Petitioner presented this claim to the state court as Issue V of his motion for post-conviction relief.  The Rule 3.850 court denied relief in a written opinion, but without a hearing.

Based on its review of the record the Rule 3.850 court made the following findings:

(1)    While jailed with the defendant prior to his jury trial, Alex Viola, a longtime friend of the defendant had conversations with the defendant in which the defendant made incriminating statements concerning his kidnaping charge herein, discussed some matters of trial strategy, and solicited Viola's aid in hiring the murder of the victim, Lori Cash, to prevent her testimony and to prevent her receipt of funds from his personal injury lawsuit.

(2)    Alex Viola disclosed the defendant's solicitation of the murder of victim Lori Cash to his wife Carol Viola, who in turn contacted the prosecutor's office and informed the prosecutor of the murder for hire plot.

(3)    The prosecutor met with Alex Viola and his criminal defense attorney, Stanley Luke, in May, 1998 in the deposition room of the Shalimar Okaloosa County Courthouse Annex where a conversation was had in which Viola revealed the murder-for-hire solicitation and defendant's incriminating statements.

(4)    On August 17, 1998, the prosecutor took a sworn taped statement from Alex Viola confirming the matters he had informed the prosecution of in May, 1998.

(5)    On October 1, 1998, Alex Viola entered pleas in his criminal cases and agreed in an Addendum to Plea Agreement (incorporated in his deposition Attachment "H") to testify truthfully in the prosecution of defendant <u>and the murder solicitation</u> case if charges were brought,

and was released on probation.

(6)     Alex Viola, once released on probation, acted as an
        undercover agent supervised by Special Agent Michael
        Bettis of the Florida Department of Law Enforcement, and
        recorded telephone calls placed to Viola from the
        defendant who was still incarcerated.  In these calls, the
        defendant continued to solicit aid in finding a "hit man" to
        kill victim Lori Cash.

(7)     Special Agent Humberto Rapado of the Florida Department
        of Law Enforcement visited the defendant at the Okaloosa
        County Jail posing as the "hit man" and discussed in code
        arranged between the defendant and Viola the proposed
        murder of the victim.

(8)     After Rapado's visit, Viola participated in two final
        undercover calls placed by the defendant from jail in
        which the murder-for-hire plot was discussed on October
        19, 1998 and October 22, 1998. On October 23, 1998 the
        undercover operation was terminated.

(9)     On January 29, 1999, the State provided formal discovery
        of Viola's cooperation.  (See Attachment "C")

The defendant cites no fact, witness statement or evidence that Viola
was not actually attempting to prevent defendant's plot to murder the
victim.  All actual evidence is directly to the contrary.

Defendant's trial counsel was not ineffective in dealing with the
devastating evidence that the defendant's close friend Viola (and the
FDLE agents) would establish the defendant's attempt to have the
victim Lori Cash murdered prior to trial.  Defense trial counsel filed and
successfully argued (Attachment U, Trial Transcript pages 16-19) a
Motion in Limine (Attachment "M") which prevented the State from
calling Viola to testify about the highly incriminating murder scheme.
Even when the State argued the defendant opened the door to this
evidence by testifying on cross-examination that he was emotionally
sympathetic during the victim's trial testimony and still cared for her,
defense trial counsel succeeded in convincing the trial court not to
allow testimony of the murder scheme.  (Attachment U, Trial Transcript

**pages 946-949) Viola was never called to the stand.**

**The defendant must establish prejudice from the alleged improper use of Viola in order to obtain relief.  He appears to assert that he was prejudiced by the State learning his trial strategy from Viola.  Since Viola did not testify at trial this could be the only possible prejudice. The record reveals that Viola had the "jailhouse" discussions in which trial strategy and the murder scheme were discussed <u>before</u> Viola had his wife contact the State Attorney's Office.  Therefore there was no violation of defendant's right to counsel on the trial strategy issue. Furthermore, no prejudice can be shown due to defendant's trial strategy being compromised by Viola since the defendant chose to reveal his trial strategy to another jail inmate Kenneth Groves, and defense trial counsel, in argument of a Motion in Limine to prohibit Groves' testimony (Attachment U, Trial Transcript pages 11-16), admitted that the defendant had revealed the defense strategy:**

> **MR. PETERSEN: The next motion is the motion concerning Kenneth Groves, motion to continue trial or in the alternative to prohibit Kenneth Groves from testifying. Kenneth Groves was apparently an inmate with my client for a certain period of time back in 1998.  I found out on Friday, June 18, that Kenneth Groves may be a witness in this case and attended an investigative hearing with Mr. Elmore on Kenneth Groves.   We were there for depositions and we finished and all of a sudden Mr. Groves is there.  This is the first time I heard about him. He has some very damaging testimony to my client. Basically, my client discussed the case with confessed to what happened and gave -- and my client gave the defense strategy, to him; all of which was passed on to Mr. Elmore. (Attachment U, Trial Transcript, page 11).**

**Kenneth Groves, just as Viola, was never called to the witness stand.**

**(Ex. P, pp. 851-54).  Based on the foregoing findings, the Rule 3.850 court held: (1) the motion contained no showing of which defense strategies were learned through Viola's cooperation, (2) the motion contained no specific factual allegation of what Viola learned after beginning cooperation as opposed to pre-cooperation, (3) Viola's**

cooperation was pursuant to a legitimate investigation into petitioner's alleged plot to have Lori murdered before trial, (4) defense counsel effectively dealt with the matter by keeping Viola from testifying, and (5) defense counsel disclosed that trial strategy had been revealed to another prisoner, Kenneth Groves, who was not a state agent, and who did not testify (ex. P, pp. 850-51).

<u>Federal Review of State Court Decision</u>

Petitioner contends that the Rule 3.850 court's holding was erroneous and that he should have been given an evidentiary hearing on the claim.  Petitioner concedes that Viola did not testify, but contends that the state used him to discover the defense's trial strategy, and that an evidentiary hearing would have disclosed what Viola told the state.  However, as the Rule 3.850 court found, petitioner told Viola about his trail strategy before Viola (through his wife) ever contacted the state, and later disclosed his trial strategy to another inmate, Kenneth Groves.  These findings, although based on a review of the record without an evidentiary hearing, are supported by the record.

Also, petitioner has come to this court with nothing more than conclusory allegations about the supposedly disclosed trial strategy.  This court will not "'blindly accept speculative and inconcrete claims . . . .'"  *Raulerson v. Wainwright*, 753 F.2d 869, 876 (11th Cir. 1985) (quoting *Baldwin v. Blackburn*, 653f2d942, 947 (5th Cir. 1981)).  Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value.  *Woodard v. Beto*, 447 F.2d 103 (5th Cir. 1971).[13] Thus, "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding.  *United States v. Jones*, 614 F.2d 80 (5th Cir. 1980).

---

[13]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

Petitioner says that he cannot discern what strategy may have been disclosed without a hearing, but he has not favored this court with the slightest hint about what that strategy *might* have been, or how the state could have used it against him. A dispassionate review of the trial shows that this was a very straightforward case. The state had eye witnesses and forensic evidence to prove every necessary disputed fact other than what the petitioner and Lori were doing while they were in the house. The state's presentation of evidence, while lengthy, was predictable. The defense trial strategy used, which was to attempt to impeach every witness based on prior inconsistent statements in depositions and reports, was equally predictable. Petitioner's testimony was realistically the only other strategy available -- to make this a "he-said, she-said" case -- and while it was not necessarily predictable, it was indirectly forecast by defense counsel's opening statement (ex. H, pp. 202-215), giving the state plenty of time to get its rebuttal witnesses ready to testify. That strategy did not work, but not because it was disclosed to the state. It did not work because the jury did not believe petitioner's testimony. Petitioner has not indicated that any other trial strategy existed that would not have been anticipated by the state absent improper disclosure, nor can this court imagine one.

Consequently, petitioner cannot show that his attorney's performance was ineffective. He simply cannot "establish that no competent counsel would have taken the action that his counsel did take." *Brownlee v. Haley*, 306 F.3d 1043, 1059 (11th Cir. 2002) (quoting *Strickland*, 466 U.S. at 687, 689-90, 104 S.Ct. at 2064-66 and *Chandler v. United States*, 218 F.3d at 1315. Furthermore, he cannot show prejudice, because he cannot show that there was a strategy that had any chance of success that may have been disclosed but not anticipated by the state. For all of the foregoing reasons, the state court's ruling did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d) (1); *Williams, supra*. Petitioner is not entitled to federal

habeas relief, and the writ should not issue.

### 3. Ineffective assistance of counsel - failed to discover photographs withheld in violation of *Brady v. Maryland*.[14]

Petitioner's third ineffective assistance of counsel claim alleges that the prosecution withheld photographic evidence in violation of *Brady*, and that counsel should have "discovered" the omission. Petitioner contends that at a pre-trial motion to suppress hearing a sheriff's deputy, Corporal LaPee, testified that there was evidence in the yard indicating that there were children in the residence, and based in part on this, he made a protective sweep of the interior. Petitioner now says that photographs taken of the residence showed clearly that there were no children's toys in the yard and therefore the "exigent circumstances" upon which the Court denied the motion to suppress did not exist. Petitioner argues that if his attorney had taken appropriate steps to obtain the photograph(s) in question, the motion to suppress would have had a different outcome.

The state produced 19 photographs of the residence taken when the home was searched pursuant to a warrant on April 17, 1997, five days after the crime. What the state did not produce, according to petitioner, was a photograph with a "bright blue object to the right of the trailer," that, according to a witness at the motion to suppress hearing, looked like a child's swimming pool (ex. B, p. 386). Petitioner asserts that no such photograph was included in the 19 photographs provided to the defense by the state, and that if his attorney had noticed this omission, the result would have been different, because there were no children's toys, and no swimming pool, in the front yard.

State Court Decision

This issue was presented to the state court in petitioner's Rule 3.850 motion

---

[14]373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

(exhibit P, pages 16-27).  The Rule 3.850 court rejected it without a hearing, holding that petitioner's conclusion that there was another photograph was not supported by the record.  The court noted that although the transcripts of the dispatcher's telephone log recorded while the crime was taking place indicated that photographs were going to be taken, there was no proof that any were actually taken that day.  Rather, the evidence was that a crime scene investigator did not go to the scene that day because no criminal case existed after Lori told investigator Donaldson that nothing had happened, and that photographs were taken later when the search warrant was served.  The 3.850 court determined that petitioner's claim that there was a missing photograph which had been withheld was an unsupported conclusion and that counsel was therefore not ineffective in discovering the alleged omission of this photograph (ex. P, pp. 844-848).

The undisputed testimony of the officers at the scene was that no search occurred on the day of the crimes other than Cpl. LaPee's security sweep.  The Rule 3.850 court further held that, regardless of what the alleged missing photograph might or might not have shown, petitioner's own witness, Chris Warren, testified that there were children's toys and a swimming pool in the yard, so petitioner's claim that the missing photograph would help him show that Cpl. LaPee's protective sweep was based on the pretext of children being present was unfounded (ex. H, p. 783-84).

Federal Review of State Court Decision

Petitioner's claim of ineffective assistance of counsel in this regard is built on a series of suppositions: (1) that photographs were taken on the date of the crime; (2) that one of the photographs was of the front yard and showed that there were no toys there; (3) that the state withheld the photographs; and (4) if counsel had discovered the missing photographs, he would have convinced the court that there was no factual basis for Cpl. LaPee's protective sweep of the house and the motion

to suppress would have been granted.

Petitioner's claim is factually unfounded. The 3.850 court found that there was no proof that any such photographs were taken. Moreover, the "missing" photograph with the blue swimming pool to the "right" of the trailer is not missing. It was introduced into evidence at trial as state's exhibit 5S (ex. CC). The photograph shows the *front* of the petitioner's mobile home. At the *left* side of the photograph is a blue object that someone might logically conclude is a child's swimming pool. The question posed to the witness upon which petitioner bases his claim indicated that the blue object was "to the right of the trailer." (Ex. C, p. 336) The question, as posed, was not whether the blue object was to the right of the photograph, but to the right of the trailer. There was a blue object on the left side of the photograph, but from the front of the trailer, it was on the right. The question was not so clearly stated as to support any proof that the allegedly missing photograph actually existed. It is equally possible that the person asking the question simply said right when he meant left, which is speculative, but it is no more speculative than petitioner's claim that there is a missing photograph and that discovery of the photograph would have made a difference.

If there was a photograph showing a front yard with no toys, the state should have disclosed it to the defense if it was material, meaning that there was a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (internal quotations omitted). The missing photograph, if it existed and showed no toys in the front yard, was not material. Petitioner's argument is grounded on his claim that the motion to suppress should have been granted because there were no children's toys or objects at the scene. This claim is entirely disproved by the testimony of Cpl. LaPee,

who made the protective sweep through the mobile home after the incident was over.  Cpl. LaPee testified that he arrived at the residence at around 7:00 a.m. Deputy Watkins, who was already present, told him that there was a hostage situation with an armed subject in the house.  After being briefed Cpl. LaPee moved to a position from which he had a good view of the rear of the house and could watch the *back* door.  Cpl. LaPee saw children's toys, including dump trucks and sand toys in a sandy area that was obviously a children's play area in the *back* yard (ex. P, p. 20).

Since the photograph at the center of this claim is of the *front* of the home, and since petitioner makes no claim that the state withheld a photograph of the *back* yard, petitioner's argument collapses of its own weight.  There was undisputed testimony of toys in the back yard, which testimony was later corroborated at trial, so the trial court's decision that counsel was not ineffective for failing to discover that there was a missing photograph was supported by the record.  Because there was no proof that the alleged missing photograph was in fact withheld, counsel cannot be faulted for failing to discover its omission.  A photograph of the front yard would not have changed the outcome of the case.  The state court's ruling did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d) (1); *Williams, supra*. Petitioner is not entitled to federal habeas relief, and the writ should not issue.

4.   <u>Trial court error - denial of motions to suppress.</u>

For his fourth ground for relief petitioner says there was trial court error in the denial of his motions to suppress.

<u>Application of *Stone v. Powell*</u>

Federal courts are precluded from conducting post-conviction review of a petitioner's Fourth Amendment claim of an unconstitutional search or seizure if the state courts provided "an opportunity for full and fair litigation" of that claim.  *See*

*Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976); *see also Bradley v. Nagle*, 212 F.3d 559, 564 (11th Cir. 2000), *cert. denied*, 531 U.S. 1128, 121 S.Ct. 886, 148 L.Ed.2d 794 (2001); *Huynh v. King*, 95 F.3d 1052, 1058 (11th Cir. 1996).  This bar applies without regard to whether the defendant actually availed himself of the opportunity to fully and fairly litigate such a claim.  *See Huynh*, 95 F.3d at 1058 (citing *Caver v. State of Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978)).  "In *Stone*, the Court reasoned that, so long as a defendant had the opportunity to present his Fourth Amendment claims to the state trial and appellate courts, the objectives of the exclusionary rule have been satisfied."  *Bradley, supra*, 212 F.3d at 564-65.

> For a claim to be fully and fairly considered by the state courts, where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court.  Where, however, the facts are undisputed, and there is nothing to be served by ordering a new evidentiary hearing, the full and fair consideration requirement is satisfied where the state appellate court, presented with an undisputed factual record, gives full consideration to defendant's Fourth Amendment claims.

*Mincey v. Head*, 206 F.3d 1106, 1126 (11th Cir. 2000) (quoting *Tukes v. Dugger*, 911 F.2d 508, 513-14 (11th Cir. 1990)); *Caver, supra*, 577 F.2d at 1191-92 ("'[F]ull and fair consideration' of a fourth amendment claim [includes] at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute."); *see also Stone, supra*, 428 U.S. at 494 n. 36, 96 S.Ct. at 3052 n. 36.[15]

---

[15]The Supreme Court, in a footnote in its *Stone* decision, cited its earlier decision in *Townsend v. Sain* to elaborate on the meaning of the phrase "full and fair litigation."  *See Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled in part, Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5, 112 S.Ct. 1715, 1717, 118 L.Ed.2d 318 (1992).  *Townsend* lays out certain factors for a court to consider in resolving whether an issue has been fully and fairly litigated.  Among these factors are whether there was a hearing procedure available, how well the factual issues were developed, and whether the trial court's fact-findings are adequately supported by the record.  *See Townsend*, 372 U.S. at 312-13, 83 S.Ct. at 757.

Furthermore, even if a state court erred in its Fourth Amendment analysis, a federal court will not consider the merits of a Fourth Amendment claim. *See Swicegood v. State of Alabama*, 577 F.2d 1322, 1324 (5th Cir. 1978).

In the instant case, petitioner filed two motions to suppress. The trial court denied the first motion after an evidentiary hearing (ex. D). Accordingly, this court will not address the matters raised in that motion. The record concerning the second motion is not altogether clear, and requires some discussion.

In his second motion to suppress, petitioner claimed he had new evidence, based on the deposition testimony of Deputy Amiel and the dispatcher's call logs, that the home was being treated as a crime scene, that the deputies were in the home for 30-45 minutes, and that the home was searched without a warrant and without probable cause. The call transcripts (while petitioner and Lori were still in the house) disclosed that "crime scene will be doing a series of photos" and "we have a [sic] on-call crime scene en route (doc. 6, p. 51). At the first suppression hearing Cpl. LaPee testified that he did a sweep of the residence for officer safety because there was a report of a firearm in the residence, because he did not know whether there might be other people in the residence, and because he feared there might be children present. He indicated that the sweep lasted for five minutes, and that no crime scene team ever went to the home.

There was no hearing on the second motion. Petitioner says the motion was denied on June 28, 1999, according to court minutes, which noted only that the court "[would] not hear second m/suppress filed by Defense - may be raised in form of directed verdict by Defense." (Doc. 27, ex. A, p. 1). According to the minutes, there was no ruling on the motion. The court simply refused to hear it. However, during Cpl. LaPee's testimony during the trial defense counsel objected "on the same grounds as mentioned in the pretrial motion" and the court overruled the objection (ex. H, pp. 560-61). The defense did move for acquittal at the conclusion of the

states case, arguing that there had been no testimony identifying the county the crime occurred in, and that the state had failed to present evidence supporting the kidnapping charge.  The motion was denied (ex. H, pp. 737-42).  Nothing was said about the legality of the search.

On direct appeal petitioner argued that the second motion was denied on June 28.  The state did not contest this, stating that "[b]y moving to suppress the seized evidence on the same ground as asserted on appeal, and by renewing the motion at trial, Appellant has preserved this issue for appellate review."  (Ex. L, p. 12).  The state did not contend that the second motion was not ruled on.  Thus, there was no formal hearing on the motion to suppress, but counsel *seems* to have renewed it during trial, something the state conceded, although possibly incorrectly.  Assuming for the sake of discussion that there was no hearing on the second motion, this ground fails on the merits.

<u>Review of Denial of Second Motion to Suppress.</u>

The petitioner sought to suppress evidence seized during the alleged search on the day of the crimes, April 12, 1997 (exs. B, E).  Nothing was seized that day, so there was nothing to suppress.  The actual search, conducted pursuant to a warrant, was performed on April 17, 2007 after Lori went to the sheriff's office and told what really happened.  The items seized - a Polaroid camera, a wooden box containing jelly and two small vibrators, a blue cloth, a "Maverick razor," contents of a bathroom trash can, a bag of carrots, two swords, and a bag of white rope - were appropriately recorded on the inventory attached to the warrant (doc. 29).  Thus, regardless of the reasons for Cpl. LaPee entering the home on April 12, his testimony that he seized no evidence was undisputed (ex. H, pp. 560-67).

On the other hand, petitioner's motion can be read more expansively, as suggesting that Cpl. LaPee and Deputy Amiel illegally entered the house on April 12, and based on what they saw while there, a warrant was later issued, and that

anything seized based on the warrant executed on April 17 was fruit of the poisoned tree. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939).  This argument fails as well.   Petitioner says there was no legal justification for a protective sweep because: (1) Cpl. LaPee and Deputy Amiel knew, through the collective knowledge of the officers involved, that there was no one in the house (including children) besides petitioner and Lori, (2) the dispatch logs showed that the deputies intended to have a crime scene unit investigate and take photographs, and (3) Cpl. LaPee said he entered the home for "safety reasons," which was an improper basis for entering the home.  The facts do not support these assertions.

First, as noted above, nothing was seized during the April 12 sweep.  Second, although the dispatcher records indicated that a crime scene team had been called, none ever showed up.  When Lori told Investigator Donaldson there had been no crime, there was nothing to investigate and the need for a crime scene team evaporated.  Third, Cpl. LaPee's testimony at the hearing on the first motion to suppress showed that there were children's toys in the back yard (Ex. C, pp. 444-445), that he and Deputy Amiel entered the home to look for other suspects, witnesses or victims, including children who might have access to a firearm, and that they were never certain how many people were in the home when they entered (*id.* at 81-84).  Fourth, the trial testimony made it clear that the scene, and law enforcement's appreciation of the scene, was chaotic.  Petitioner had grabbed his estranged wife in their home, pulled out a machete, pushed a woman off the porch, and slammed the door (ex. H, p. 478);   Lori's sister thought she saw a gun in petitioner's waistband (*id.* at 229, 287); Deputy Watkins and Deputy Amiel, two of the first law enforcement officers to arrive at the scene, both heard petitioner shout that he had a gun and a hostage, and would "hurt her" (*id.* at 290, 499); Sgt. Bennet talked to petitioner on the telephone and was told that he would harm himself and

Lori (*id*. at 534); petitioner had threatened to hurt or kill Lori if her sister called law enforcement (*id*. at 290, 441, 479, 499); petitioner said he had a hostage (*id*. at 499); petitioner told Lori's sister that he was going to hurt both Lori and himself (*id*. at 551); Lori said she was not being hurt, that no one else was there, and that she was fine (*id*. at 240, 594); petitioner said he would not let Lori leave (*id*. at 551, 594); Lori said petitioner did not have a gun, but petitioner said he did (*id*. at 544).

From all this petitioner distills the statement by Lori, while on the telephone with petitioner present, that no one else was present, and makes it true, regardless of how many other conflicting statements were made during the two hour ordeal. So when the dispatcher's recording had petitioner asking "Do you believe I'm going to hurt you?" with Lori answering "You're not going to hurt me," petitioner asserts that the deputies had to take her response at face value and ignore all other facts indicating that Lori was probably speaking under duress given evidence of a hostage situation, a machete, a gun, and potential or actual violence. They also had to "know" that there was no one else in the house. Perhaps if petitioner and Lori had walked out arm in arm at that moment and asked what the fuss was about, the situation would have been different. Petitioner in effect wants this court to believe that is what happened. But that is not what happened. Petitioner came out after more than two hours of rambling, at times incoherent discussions with various people and was taken for a psychological evaluation. Lori was "nervous," told an investigator nothing had happened and wanted to leave it at that, but indicated that she might want to tell him more later (*id*. at 640-44). The deputies had ample reason to question just about everything that had been said during the course of the two hour ordeal. They therefore did not "know" that there was no one else in the home.

Petitioner relies on *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), which held that during an arrest inside a person's home, a protective sweep is justified only when there is a reasonable suspicion that there might be

someone else in the house.  However, nothing in the evidence in *Buie* hinted at anyone else being present.  Here, chaotic discussions with a hostage taker, known to have a machete and suspected of having as gun, with the real possibility of children being in the home presented an entirely different picture.

The ultimate test is based on the totality of the circumstances.  In *United States v. Antwine*, 873 F.2d 1144 (8th Cir. 1989) the court approved a protective sweep when, after an arrest, law enforcement knew there were children present and that there was a gun in the house, citing *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d  550 (1984) (holding that  an officer's legitimate concern for another's safety was an exigent-circumstances exception to the warrant requirement.)  The only difference here was the degree of knowledge concerning the gun and children, but under the totality of the circumstances, it was not unreasonable for the officers to suspect that there was a gun in the house and that there might be children present.  Petitioner has not shown error by the state court in refusing to grant a hearing on his second motion to suppress, or in the alternative, by denying it without a hearing.  Petitioner is not entitled to federal habeas relief, and the writ should not issue.

> 5.    **<u>Trial court error - refusal to disqualify prosecutor and allowing prosecutor Bishop to testify.</u>**

For his last ground for relief petitioner contends that the state court erred when it refused to disqualify the state attorney's office from prosecuting the case, and compounded its error when it allowed Assistant State Attorney Bishop to testify for the state over defense objection.  This claim is procedurally defaulted.  Although counsel appropriately moved to disqualify the state attorney's office, and appropriately objected to Mr. Bishop testifying, when he appealed petitioner argued only Florida law and cited no federal cases or federal constitutional violations in his brief (ex. K, pp. 22-32) or in his reply brief (ex. M, p. 4).  He therefore failed to present

a federal claim to the state court for resolution. *Duncan v. Henry*, 513 U.S. 364, 115 S.Ct. 887. He is procedurally barred from returning to state court to present the federal claim. Petitioner has made none of the requisite showings to overcome his default, so this court will not address the issue.

Accordingly, it is ORDERED:

The clerk shall change the docket to reflect that Walter A. McNeil is the respondent, and it is respectfully

And it is respectfully RECOMMENDED:

That the petition for writ of habeas corpus, (doc. 1) challenging the conviction and sentence in the case of *State of Florida v. Lawrence Anthony Festa, Jr.*, in the Circuit Court of Okaloosa County, Florida, case no. 97-606, be DENIED, and that this cause be DISMISSED and the clerk be directed to close the file.

At Pensacola, Florida this 25th day of November, 2008.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. See 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).